UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------- x
                                                            :
IN RE WORLD TRADE CENTER LOWER              :    Docket: 21-mc-102
MANHATTAN DISASTER SITE LITIGATION          :
                                                            :
                                                            :
----------------------------------------------------------- x
TADEUSZ KOWALEWSKI and BEATA         :    **ORDER AND OPINION**
KOWALEWSKI,                                           :    **DENYING IN PART AND**
                                                            :    **GRANTING IN PART**
                          Plaintiffs,                      :    **DEFENDANTS' MOTIONS**
                                                            :    **FOR SUMMARY JUDGMENT**
            -against-                                    :    **DISMISSING COMPLAINT**
                                                            :
DEUTSCHE BANK TRUST COMPANY          :    Case Number: 06-cv-01521
AMERICAS, ET AL.,                                  :
                                                            :
                          Defendants.                   :
----------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:


         In this action, Plaintiff Tadeusz Kowalewski and his wife, Beata Kowalewski,

assert claims for common law negligence and violations of sections 200 and 241(6) of the New

York Labor Law.  The claims are based upon injuries Tadeusz Kowalewski allegedly suffered

after working in numerous buildings in the vicinity of the World Trade Center site in the weeks,

months, and years following the 9/11 terrorist attacks.  Kowalewski asserts his claims against

various owners, managing agents, lessees, environmental consultants, and contractors

(collectively, "Defendants") that allegedly owned, managed or worked in the buildings.

         The Defendants have moved for summary judgment to dismiss the claims against

them.  The alleged owners, managing agents, and lessees moving for summary judgment are: the

City of New York, Verizon New York Inc., Battery Park City Authority, Merrill Lynch & Co.,

Inc.,[1] Liberty View Associates, L.P.,[2] Related BPC Associates, Inc., Related Management Co.,

L.P., Deutsche Bank Trust Company Americas (f/k/a Bankers Trust Company), Deutsche Bank

Trust Corporation (f/k/a Bankers Trust Corporation), and DB Private Clients Corp. (f/k/a BT

Private Clients Corp.) (collectively, the "Owner Defendants").  The environmental consultants

moving for summary judgment are: Hillmann Environmental Group, LLC, Weston Solutions,

Inc. (together, the "Environmental Consultant Defendants"), and Indoor Environmental

Technologies, Inc. ("IET").  The contractors moving for summary judgment are Tishman

Interiors Corporation ("TIC") and Blackmon-Mooring Steamatic Catastrophe, Inc. ("BMS").

The architectural firms William F. Collins, AIA Architects, LLP ("WF Collins") and Syska

Hennessy Group, Inc. ("Syska Hennessy") have also moved for summary judgment.  For the

following reasons, the Defendants' motions are granted in part and denied in part.

## I.    Background[3]

This opinion is one more in a series of opinions resolving numerous motions for

summary judgment filed by defendants in cases arising from abatement work performed by

various plaintiffs in the buildings surrounding the World Trade Center site in the aftermath of the

September 11, 2001 terrorist attacks.  I previously provided, in detail, the facts relevant to these

motions in *In re World Trade Center Lower Manhattan Disaster Site Litigation*, No. 09-cv-680,

2014 WL 4446153 (S.D.N.Y. Sept. 9, 2014).  For this reason, familiarity with the facts is

presumed and this opinion will describe only the facts relevant to my disposition of the issues

particular to the motions at issue here.

---

[1] Merrill Lynch & Co., Inc. also moves on behalf of the following entities: WFP Tower B Co., L.P., WFP Tower B Co., G.P., WFP Tower D Co., L.P., and WFP Tower D Co., G.P. Corp.

[2] Liberty View Associates, L.P., also moves on behalf of The Related Realty Group, Inc. and The Related Companies, L.P.

[3] The facts stated here are either undisputed or presented in the light most favorable to Kowalewski, as the non-moving party. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

A.    **2 World Financial Center**

2 World Financial Center is located directly west of the World Trade Center site. On September 11, 2001, Brookfield Financial Properties L.P. ("Brookfield") owned WFP Tower B Co. L.P., which, in turn, owned 2 World Financial Center and leased the building to Merrill Lynch & Co., Inc. ("Merrill Lynch"). *See* Aff. Daniel M. Kindbergh Supp. Merrill Lynch Mot. Summ. J. ("Kindbergh Aff.") ¶ 3.   Battery Park City Authority ("BPCA") was the ground lessor. *See* Decl. Philip Goldstein Supp. Merrill Lynch Mot. Summ. J. ("Goldstein Decl."), Exh. EE at 16:13-18. 2 World Financial Center sustained substantial damage to its eastern façade and a significant amount of dust and debris entered the building. *See* Goldstein Decl., Exh. Q.   The "Winter Garden," a glass-enclosed lobby connecting 2 World Financial Center and 3 World Financial Center, suffered severe structural damage including broken windows and demolished walls. *See* Decl. Gregory J. Cannata Supp. Pls.' Opp'n Defs.' Mots. Summ. J. ("Cannata Decl."), Exh. 139.

Merrill Lynch retained Weston Solutions, Inc. ("Weston") and GPS Environmental Consultants, Inc. ("GPS") to test and analyze the dust and debris inside 2 World Financial Center. *See* Goldstein Decl., Exh. Q, Exh. Z at 118:13-119:15.   Beginning September 26, 2001, Weston conducted comprehensive testing for numerous potential air contaminants, including asbestos, fibrous glass, heavy metals, and volatile organic compounds. *See* Goldstein Decl., Exh. M. After both GPS's and Weston's air testing revealed the presence of asbestos, both allegedly advised Merrill Lynch to implement asbestos-specific procedures. *See* Goldstein Decl., Exh. Q, Exh. X at 103:18-105:18.   Weston, however, denies that it advised Merrill Lynch with respect to the asbestos abatement. *See* Decl. Nicholas Kauffman Supp. Weston Mot. Summ. J. ("Kauffman Decl."), Exh. O ¶¶ 5-7.   There is no evidence that Weston tested the pH

3

level of the dust. *See, e.g.*, Cannata Decl., Exh. 123.  While Weston denies directly supervising

the abatement workers or developing a safety protocol for the general abatement work at 2

World Financial Center, *see* Kauffman Decl., Exh. O ¶¶ 5-7, it did create a remediation protocol

and provided project monitoring for mold abatement conducted in the basement, *see* Kauffman

Decl., Exh. O ¶ 8.  Kowalewski also presents evidence that Weston oversaw "all phases" of the

cleanup work at 2 World Financial Center. *See* Cannata Decl., Exh. 4 at 106:3-107:16.

      Certain tenants at 2 World Financial Center retained Hillmann Environmental

Group, LLC ("Hillmann") as their environmental consultant. *See* Decl. Salvatore J. Calabrese

Supp. Hillmann Mot. Summ. J. ("Calabrese Decl."), Exh. C, ¶¶ 20-42.  Hillmann did not have

any agreement with Merrill Lynch nor did it perform any work for Merrill Lynch. *See* Calabrese

Decl., Exh. C ¶ 20.  However, Hillmann did conduct environmental monitoring during and after

the cleanup and conducted an asbestos survey for Brookfield in the retail space. *See* Calabrese

Decl., Exh. C ¶¶ 32, 43-46.

      Merrill Lynch retained Pinnacle Environmental Corporation ("Pinnacle") and

BMS to conduct the cleanup work. *See* Goldstein Decl., Exh. O, Exh. Q.  The project began on

September 24, 2001 and consisted of three phases: bulk cleanup, fine cleaning, and cleaning of

the building's HVAC system. *See* Goldstein Decl., Exh. Q.  Pinnacle workers also conducted the

mold abatement in the basement levels. *See* Kauffman Decl., Exh. O ¶ 8.  Because initial

environmental testing revealed asbestos levels above 1%, Pinnacle implemented asbestos

abatement procedures during the cleanup. *See* Goldstein Decl., Exh. O at 2.  BMS performed

work at 2 World Financial Center between October 18, 2001 and August 27, 2002. *See* Decl.

Jacqueline Cuozzo Supp. BMS Mot. Summ. J. ("Cuozzo Decl."), Exhs. 10-13.  During that time,

BMS supervised certain Pinnacle workers. *See* Goldstein Decl., Exh. K, Exh. S.  Throughout the

remediation, GPS and Weston provided continuous air monitoring and safety consulting. *See* Goldstein Decl., Exh. I, Exh. Q, Exh. Z at 118:13-24, 194:11-23.

On October 19, 2001, IET conducted a single post-cleanup testing of the HVAC system for asbestos, lead, and microbial contamination. *See* Aff. John Stanley Supp. IET Mot. Summ. J. ("Stanley Aff.") ¶ 4, Exh. A. Beginning in February 2002, IET provided limited consulting services and project management for environmental testing of the HVAC system at 2 World Financial Center. *See* Stanley Aff., Exh. B, Exh. D. IET presents evidence that it neither developed safety protocols for the abatement work performed by Pinnacle nor directly supervised Kowalewski's work. *See* Stanley Aff. ¶¶ 13-15.

Kowalewski, a licensed asbestos handler and member of Local Union 78, was hired by Pinnacle to participate in the bulk and fine cleaning phases of the project. *See* Goldstein Decl., Exh. B; Cannata Decl., Exh. 49 at 109:6-110:2, 126:13-128:13, 135:3-25. He worked at both 2 World Financial Center and 4 World Financial Center between September 20, 2001 and November 4, 2001 for approximately 176 hours, although the record does not distinguish between the two buildings. *See* Goldstein Decl., Exh. A. Kowalewski did not work for BMS at 2 World Financial Center. *See* Cannata Decl., Exh. 51 at 491:17-492:9; Cuozzo Decl., Exh. 14, Exh. 19. His work consisted of bagging and removing dust and debris. *See* Cannata Decl., Exh. 49 at 109:6-17. Other workers removed metal studs and sheetrock, and cut open the HVAC ducts to clean inside. *See* Cannata Decl., Exh. 53 at 239:2-23, Exh. 54 at 352:23-353:6. Kowalewski presents evidence that he was not provided with adequate respiratory equipment and that a decontamination unit was not initially available. *See, e.g.*, Cannata Decl., Exh. 49 at 102:11-22, 110:6-112:13. Further, he alleges that he was required to reuse clogged filters. *See* Cannata Decl., Exh. 49 at 112:3-13.

## B.     4 World Financial Center

4 World Financial Center is located one block west of the World Trade Center site at 250 Vesey Street.  On September 11, 2001, Brookfield owned WFP Tower D Co. L.P., which, in turn, owned the building and leased it to Merrill Lynch.  *See* Kindbergh Aff. ¶ 4.  BPCA was the ground lessor.  *See* Goldstein Decl., Exh. EE at 16:13-18.  4 World Financial Center suffered no structural damage but dust and debris infiltrated the building.  *See* Cannata Decl., Exh. 34 at 44.  In mid-September, Merrill Lynch hired Weston to "provide oversight to all asbestos handlers in the building" and have air samples "analyzed for [asbestos containing material]" between September 15, 2001 and September 21, 2001.  Goldstein Decl., Exh. F.  Merrill Lynch retained Pinnacle to perform the remediation work.  *See* Goldstein Decl., Exh. J.  BMS did not perform any work at 4 World Financial Center.  *See* Cuozzo Decl., Exh. 17 at 164:3-5, Exh. 18 at 61:3-9. In October 2001, after the asbestos abatement work was complete, Weston began testing for other elements, such as volatile organic compounds, PCBs, fibrous glass, heavy metals, and dioxons.  *See* Cannata Decl., Exh. 152 at 26:9-27:8.

While Weston claims that it neither developed a safety protocol for work at 4 World Financial Center nor supervised the workers, *see* Kauffman Decl., Exh. O ¶ 9, a report it prepared in October 2001 notes that all asbestos abatement workers were required to wear half-mask respirators and that Weston monitored subcontractor compliance with safety protocols and regularly tested the air for asbestos, *see* Goldstein Decl., Exh. J § 2.4.  Further, the record reflects a significant focus on asbestos abatement, *see, e.g.*, Goldstein Decl., Exh. F; Cannata Decl., Exh. 157, Exh. 158, but it is unclear whether Merrill Lynch, Weston or GPS made the decision to treat the initial remediation as an asbestos abatement, *see, e.g.*, Cannata Decl., Exh. 152 at 16:18-24.

As noted above, Kowalewski worked for Pinnacle at 2 World Financial Center and 4 World Financial Center for approximately 176 hours between September 20, 2001 and November 4, 2001. *See* Goldstein Decl., Exh. A, Exh. B. His work at 4 World Financial Center consisted of removing floor tiles and cleaning the walls. *See* Cannata Decl., Exh. 49 at 132:2-8. Other workers vacuumed inside HVAC ducts and demolished sheetrock. *See* Cannata Decl., Exh. 34 at 44, 156, Exh. 53 at 261:2-5, 228:11-20. Kowalewski wore a half-mask respirator while working at 4 World Financial Center and a decontamination unit was not available. *See* Cannata Decl., Exh. 49 at 133:22-134:21.

### C.     140 West Street

140 West Street was owned by Verizon New York, Inc. ("Verizon") and was located directly north of the World Trade Center site and west of 7 World Trade Center. The building housed four of Verizon's network switches that provided telecommunications service to lower Manhattan. *See* Decl. Brett J. Broadwater Supp. Verizon Mot. Summ. J. ("Broadwater Decl."), Exh. C at 111:23-112:25, Exh. G at 37-39. The building sustained major damage on September 11, 2001. *See* Cannata Decl., Exh. 7 at 7-2. Steel beams from the collapse of 7 World Trade Center pierced the building's eastern façade leaving a four-story gash in the structure and a six-story high mound of debris leaning against the building. *See* Decl. Lee Ann Stevenson Supp. Verizon's Mot. Summ. J. Based on Immunity ("Stevenson Decl."), Exh. J at 7-12; Cannata Decl., Exh. 137. In addition, 140 West Street's two lowest basements flooded and the cable vault was punctured, rendering Verizon's telecommunications equipment inoperable. *See* Broadwater Decl., Exh. C at 111:23-112:25. The building was widely contaminated with World Trade Center dust. *See* Cannata Decl., Exh. 17A ¶ 4.

Verizon hired Hillmann to conduct initial bulk and air sampling as well as to act as project monitor for the debris and dust remediation project. Hillmann initially tested the dust and air for asbestos, and later a range of contaminants, including volatile organic compounds, PCBs, and heavy metals. *See* Broadwater Decl., Exh. I at 81:5-83:9, 89:21-93:19, Exh. V, Exh. W. Based upon Hillmann's assessment, and Verizon's consultation with various federal, state, and local agencies, Verizon treated the dust and debris removal as an asbestos abatement. *See* Stevenson Decl., Exh. A at 191:2-192:13; Broadwater Decl., Exh. P. Hillmann developed the specifications for the remediation project, *see* Broadwater Decl., Exh. P, Exh. I at 164:7-17, and made recommendations regarding the type of respiratory equipment to be worn, *see* Broadwater Decl., Exh. S. Verizon retained LVI Services, Inc. ("LVI")—an asbestos abatement contractor— to perform the removal and cleanup. *See* Stevenson Decl., Exh. A at 134:19-135:14. LVI, in turn, hired Kowalewski to assist with the cleanup. *See* Broadwater Decl., Exh. AH.

In addition, Verizon retained two architectural firms—Syska Hennessy and WF Collins—to design and produce drawings to be used in the restoration of 140 West Street. *See, e.g.*, Aff. John W. Magliano Supp. Syska Hennessy Mot. Summ. J. ("Magliano Aff."), Exh. B at 24:10-26:25. Both firms were retained pursuant to a previously executed Design Professional Agreement. *See* Magliano Aff., Exh. A; Aff. Steven Saraniero Supp. WF Collins Mot. Summ. J. ("Saraniero Aff."), Exh. A. Those agreements prohibited the firms from exercising any responsibility over the means or method of the restoration work performed. *See* Magliano Aff., Exh. A § 14.1; Saraniero Aff., Exh. A § 14.1. The firms conducted the majority of their work offsite and their onsite conduct was limited to ensuring that the reconstruction conformed to their design. *See, e.g.*, Saraniero Aff., Exh. B at 71:22-72:9. Further, neither firm had any influence over the safety and remediation protocol implemented at 140 West Street. *See* Magliano Aff. ¶¶

8

2-3, Exh. A § 14.1; Saraniero Aff. ¶¶ 3, 5, Exh. A § 14.1.  Kowalewski fails to point to any
evidence to the contrary.

Verizon contends that supervisors from both LVI and Hillmann enforced the
safety protocols and ensured that workers wore respiratory equipment required for asbestos
abatement.  *See* Stevenson Decl., Exh. V at 12:2-19, Exh. X at 417:23-419:2, Exh. Q at 164:7-
17.  However, Kowalewski has pointed to evidence that Verizon maintained an active
supervisory presence at the worksite.  For example, Verizon helped develop the asbestos
abatement contractors' work plan, *see* Suppl. Decl. Gregory J. Cannata Supp. Pls.' Opp'n
Verizon Mot. Summ. J. Based on Immunity ("Cannata Suppl. Immunity Decl."), Exh. 1 at 151:3-
13, and enforced the decontamination procedures, *see* Cannata Suppl. Immunity Decl., Exh. 1 at
162:4-22, Exh. 2 at 66:7-68:14.  In addition, two Hillmann employees testified that Verizon
decided what personal protective equipment the abatement workers would wear.  *See* Cannata
Decl., Exh. 115 at 75:15-76:3, Exh. 116 at 80:9-82:6.  Verizon's Director of Safety, Health, and
Environment testified that Verizon instructed the asbestos abatement contractors "what needed to
be done and how it needed to be done."  Cannata Suppl. Immunity Decl., Exh. 6 at 242:15-243:3.

Kowalewski worked at 140 West Street for approximately 122 hours between
October 11, 2001 and October 24, 2001.  *See* Broadwater Decl., Exh. AG.  His work consisted of
disassembling machinery, clearing debris, and removing floor and ceiling tiles.  *See* Cannata
Decl., Exh. 49 at 120:16-121:11.  Kowalewski worked in equipment rooms and inside "chutes."
Cannata Decl., Exh. 51 at 421:19-423:5.  Other workers demolished walls and removed window
frames.  *See* Cannata Decl., Exh. 17A.  Kowalewski testified at his deposition that a
decontamination unit was not initially available.  *See* Cannata Decl., Exh. 49 at 122:20-24.

9

D.   **130 Liberty Street**

130 Liberty Street is located directly south of the World Trade Center site and was owned by Deutsche Bank Trust Company Americas ("DBTCA") on September 11, 2001. *See* Aff. Howard Becker Supp. Deutsche Bank Mot. Summ. J. ("Becker Aff.") ¶¶ 3, 5-6.  Neither Deutsche Bank Trust Corporation nor DB Private Clients Corp. held any possessory interest in 130 Liberty Street. *See* Becker Aff. ¶ 7.  The building sustained major damage including damage to the façade and hundreds of broken windows, and was later demolished. *See* Cannata Decl., Exh. 7; Decl. Peter E. Wies Supp. City of New York's Mot. Summ. J. ("Wies Decl."), Exh. L.  All remediation work was done on behalf of DBTCA and neither Deutsche Bank Trust Corporation nor DB Private Clients were involved in the retention of contractors. *See* Becker Aff. ¶ 8.  There is evidence that the City of New York exercised some degree of control over 130 Liberty Street between September 11, 2001 and December 2001. *See* Wies Decl., Exh. I at 29:14-22.

DBTCA retained Ambient Group, Inc. ("Ambient") and R.J. Lee Group, Inc. ("R.J. Lee") to perform environmental testing at 130 Liberty Street. *See* Decl. Michael A. Savino Supp. TIC Mot. Summ. J. ("Savino Decl."), Exh. J at 310:4-8.  TIC alleges that Ambient and R.J. Lee created the remediation protocols for the building. *See* Savino Decl., Exh. J at 310:4-8.  However, neither DBTCA nor Kowalewski point to anything evidencing the scope of the work for which DBTCA retained Ambient and R.J. Lee.

DBTCA retained TIC to act as "construction manager" at 130 Liberty Street. *See* Savino Decl., Exh. E ¶ 2.  TIC presents evidence that it lacked decision-making authority over the safety and remediation protocols and, specifically, the personal protective equipment required to be worn at the worksite. *See* Savino Decl., Exh. E ¶ 4, Exh. J at 305:18-20, 310:4-8,

Exh. O at 84:8-85:2, Exh. P.  Specifically, TIC's role was limited to hiring asbestos abatement

contractors in accordance with the remediation plan developed by Ambient and R.J. Lee.  *See*

Savino Decl., Exh. H at 72:5-14.  Kowalewski fails to present any contrary evidence.

DBTCA retained PAL Environmental Services ("PAL")—a licensed asbestos and

hazard abatement contractor—to conduct the debris removal and asbestos remediation at 130

Liberty Street.  *See* Decl. Richard H. Brown Supp. Deutsche Bank Mot. Summ. J. ("Brown

Decl."), Exh. N, Exh. I at 17:4-25.  PAL developed a Health and Safety Plan which provided that

the "Corporate Health and Safety Manager shall have the final decision concerning the

applicability or usability of personal protective equipment."  Brown Decl., Exh. K § 4.1.  It is not

apparent from the record who acted as the Corporate Health and Safety Manager.  In addition,

the Health and Safety Plan stated that "PAL does not anticipate providing respirators for the type

of work performed."  Brown Decl., Exh. K § 4.13.  DBTCA, however, contends that PAL

conducted air sampling and adjusted the respiratory equipment requirements based on the results.

*See* Brown Decl., Exh. I at 37:12-20.

In addition, Deutsche Bank's insurers retained LVI to perform work at 130

Liberty Street.  *See* Brown Decl., Exh. H at 112-114:23.  The scope of the work performed and

requirements of any remediation protocol is not clear from the record.  However, DBTCA

allegedly informed LVI of the possible presence of asbestos and dangerous substances in the

building.  *See* Brown Decl., Exh. O ¶ 7.

Kowalewski performed debris removal and asbestos remediation at 130 Liberty

Street for PAL between January 19, 2004 and April 19, 2004.  *See* Brown Decl., Exh. C, Exh. E

at 243:6-14.  He also worked for LVI between July 19, 2004 and November 29, 2004.  *See*

Brown Decl., Exh. C.  PAL  and LVI employees exclusively supervised Kowalewski's daily

11

work. *See* Brown Decl., Exh. F at 486:6-21, Exh. J at 291:11-23. His work included
encapsulating asbestos, disassembling HVAC systems and kitchen equipment, removing debris
and ceiling tiles, removing concrete slabs, making small openings on the outside of the building
for the installation of scaffolding, boarding up broken windows, and shredding electronic
equipment. *See* Brown Decl., Exh. E at 245:12-249:23, 291:20-292:9. Other workers
demolished sheetrock walls and partitions. *See* Cannata Decl., Exh. 18C, Exh. 19E. Kowalewski
testified that he did not work in any confined spaces at 130 Liberty Street. *See* Cannata Decl.,
Exh. 50 at 268:8-16. Kowalewski wore a half-mask respirator with asbestos filters while
working at 130 Liberty Street. *See* Brown Decl., Exh. E at 249:20-250:3.

      **E.**    **4 Albany Street**

      4 Albany Street is located one block south of the World Trade Center site and was
solely owned by DBTCA. *See* Becker Aff. ¶¶ 3, 9-10. DBTCA presents evidence that neither
Deutsche Bank Trust Corporation nor DB Private Clients Corp. held any possessory interest in 4
Albany Street. *See* Becker Aff. ¶¶ 4, 11. Further, all remediation work was done on behalf of
DBTCA and neither Deutsche Bank Trust Corporation nor DB Private Clients were involved in
the retention of contractors. *See* Becker Aff. ¶¶ 4, 12. On September 11, 2001, the building
sustained moderate damage, including broken windows and an infiltration of dust and debris.
*See* Cannata Decl., Exh. 7.

      DBTCA retained TIC to act as "construction manager" at 4 Albany Street. *See*
Savino Decl., Exh. F ¶ 2. TIC agreed to "administer, manage and coordinate the performance of
independent contractors." Savino Decl., Exh. F ¶¶ 2-3. TIC presents evidence that DBTCA and
its environmental consultants, and not TIC, had decision-making authority over the safety and
remediation protocols and, specifically, the protective equipment required at the worksite. *See*

Savino Decl., Exh. F ¶ 4, Exh. G at 25:25-27:5, Exh. R ¶ 1.  TIC's role was limited to recommending asbestos abatement contractors in accordance with the remediation plan developed by other consultants hired by DBTCA.  *See* Savino Decl., Exh. G at 25:25-27:15. Kowalewski fails to point to any contrary evidence.

DBTCA retained PAL to conduct the remediation at 4 Albany Street.  Because initial testing revealed the presence of asbestos, the remediation was treated as an asbestos abatement.  *See* Savino Decl., Exh. G at 25:9-26:7.  There is evidence that PAL developed a Health and Safety Plan with similar language to that prepared for the work performed at 130 Liberty Street.  *See* Brown Decl., Exh. K.  Kowalewski was exclusively supervised by PAL employees.  *See* Brown Decl., Exh. E at 238:19-240:19, 485:22-486:5.  Although Kowalewski's submissions suggest that Ambient performed environmental testing at 4 Albany Street, he points to evidence relevant only to 90 Church Street in support.  *See* Cannata Decl., Exh. 148.  The scope of any environmental testing performed at 4 Albany Street is not apparent from the record.

Kowalewski worked for PAL at 4 Albany Street from January 31, 2005 to March 21, 2005.  *See* Brown Decl., Exh. C.  His work included encapsulating asbestos, removing debris, insulation and floor tiles, building a decontamination unit, and disassembling the HVAC system.  *See* Brown Decl., Exh. E at 235:14-239:24.  Other workers removed ceiling tiles, sheetrock, and furniture, and cleaned bathrooms and interior offices.  *See, e.g.*, Cannata Decl., Exh. 19C.  Kowalewski testified that he did not work in any confined spaces at 4 Albany Street. *See* Cannata Decl., Exh. 50 at 262:20-263:14, 268:8-16.  Kowalewski wore a half-mask respirator with asbestos filters.  *See* Brown Decl., Exh. E at 241:8-19.

**F.     225 Rector Street**

225 Rector Street is located two blocks south and one block west of the World

Trade Center site.  The building was owned by Liberty View Associates, L.P. ("Liberty View")

on September 11, 2001.  *See* Decl. Virginia G. Futterman Supp. Liberty View Mot. Summ. J.

("Futterman Decl."), Exh. A ¶ 5.  Related Management Co., L.P. ("RMC") managed 225 Rector

Place.  *See* Futterman Decl., Exh. A.  Related BPC Associates, Inc. had no legal interest in, or

supervisory control over, the property.  *See* Futterman Decl, Exh. A ¶ 9.  225 Rector Place did

not sustain any structural damage but World Trade Center dust infiltrated the building.  *See*

Cannata Decl., Exh. 187 at 79:19-80:10.

RMC retained Pinnacle, a licensed asbestos abatement contractor, to "clean

apartments of suspect[ed] Asbestos debris" at 225 Rector Place following the September 11th

attacks.  Futterman Decl., Exh. F.  Pinnacle's work was limited to cleaning apartments and the

building's lobby.  *See* Futterman Decl., Exh. K at 184:15-185:20.  Liberty View presents

evidence that it did not direct, control or supervise Pinnacle's work.  *See* Futterman Decl., Exh. J

at 61:18-23, 68:20-69:14.  RMC retained ATC Associates Inc. ("ATC") to perform

environmental testing.  *See* Cannata Decl., Exh. 142.  ATC performed testing in compliance with

the New York City Department of Environmental Protection's September 14, 2001 letter

requiring compliance with asbestos regulations.  *See* Cannata Decl., Exh. 142.  ATC also

provided oversight of the cleanup work and developed the remediation protocol.  *See* Cannata

Decl., Exh. 198 at 236:21-237:14.  A report ATC prepared notes that all workers were required

to wear half-mask respirators with filter cartridges.  *See* Cannata Decl., Exh. 142 at 3.

Kowalewski alleges to have worked at 225 Rector Place for 22 hours for Pinnacle

during the week of October 1, 2001.  *See* Futterman Decl., Exh. E at 4; Cannata Decl., Exh. 49 at

137:19-21.  While neither party points to evidence indicating what work Kowalewski performed

at the location, Pinnacle's work was limited to cleaning dust.  *See* Cannata Decl., Exh. 187 at

31:13-19.  Pinnacle provided Kowalewski with personal protective equipment and required that

he wear a half-mask respirator.  *See* Futterman Decl., Exh. K at 25:17-25, 175:10-13.

## II.    Standard of Review

"The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue

of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In ruling on a

motion for summary judgment, the court must view all evidence in the light most favorable to

the nonmoving party, *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d

Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor

of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford*, 391 F.3d at

83.  However, in deciding a motion for summary judgment, a District Court is not required to

"scour the record on its own in a search for evidence" where the non-moving party fails to

adequately present it.  *CILP Assocs. LP v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 125 (2d

Cir. 2013) (internal quotations and citations omitted).

## III.    Discussion

### A.    Exceptions to the Duty to Provide a Safe Workplace

Various Defendants argue that Kowalewski's claims under the New York Labor

Law are barred by two related exceptions to the duty to provide a reasonably safe workplace.

The first exception applies to injuries sustained due to defective conditions that are "part of or

inherent in" the very work being performed or conditions that are "readily observed by reasonable use of the senses in light of the worker's age, intelligence and experience." *Bombero v. NAB Constr. Corp.*, 10 A.D.3d 170, 171 (1st Dep't 2004) (holding no duty owed to employee who walked directly on exposed steel bars that were part of the construction) (citing *Gasper v. Ford Motor Corp.*, 13 N.Y.2d 104 (1963)). The second exception applies where the particular defect giving rise to a plaintiff's injury was the very defect the injured plaintiff was hired to remediate. *See Kowalsky v. Conreco Co.*, 264 N.Y. 125, 128 (1934) ("An employee cannot recover for injuries received while doing an act to eliminate the cause of the injury.").

Kowalewski points to evidence demonstrating a significant focus on asbestos abatement at each building in which he worked. This is sufficient to raise a genuine issue of fact as to whether, in the terms of his hiring, he was made aware that the dust he was hired to remove was "high-alkaline" dust, or that he was aware of the particular hazard it posed. Accordingly, for the reasons previously elaborated in *In re World Trade Center Lower Manhattan Disaster Site Litigation*, No. 09-cv-680, 2014 WL 4446153, at *11-12 (S.D.N.Y. Sept. 9, 2014), I decline to grant the Defendants' motions on this basis.

**B.    The Scope of the Duty Imposed by the New York Labor Law**

Various Defendants argue that they owed no duty under New York Labor Law because they were not owners, general contractors, or statutory "agents" under section 200 or section 241(6) of the New York Labor Law. In order for a party to have a duty under section 200, it must "have the authority to control the activity bringing about the injury to enable it to avoid or correct an unsafe condition." *Russin v. Louis N. Picciano & Son*, 54 N.Y.2d 311, 317 (1981). Likewise, a party will be considered a statutory "agent" under section 241(6) if it has the authority to control the "injury producing activity." *Id.* at 317-18. Furthermore, section 241(9)

16

provides that "[n]o liability for the non-compliance with any of the provisions of [section 241] shall be imposed on . . . architects . . . who do not direct or control the work for activities other than planning and design." N.Y. Labor Law § 241(9) (McKinney 2014).

Kowalewski has presented evidence, sufficient to raise a triable issue of fact, that the Environmental Consultant Defendants either developed the remediation protocols (including the required personal protective equipment to be worn by the workers) or influenced the decision to the treat the remediation as an asbestos abatement in the respective buildings for which they were retained. *See* Goldstein Decl., Exh. J § 2.4, Exh. X at 103:18-105:18; Kauffman Decl., Exh. O ¶ 8; Cannata Decl., Exh. 4 at 106:3-107:16, Exh. 152 at 16:18-24; Calabrese Decl., Exh. C ¶¶ 32, 43-46; Stevenson Decl., Exh. A at 191:2-192:13; Broadwater Decl., Exh. I at 164:7-17, Exh. P, Exh. S. Accordingly, for the reasons previously elaborated in *In re World Trade Center Lower Manhattan Disaster Site Litigation*, No. 09-cv-680, 2014 WL 4446153 at *12-14, I hold that Kowalewski has raised a triable issue of fact as to whether Hillmann or Weston had the authority to "avoid or correct" the alleged use of inadequate respiratory equipment, *Russin*, 54 N.Y.2d at 317, and therefore owed a duty to Kowalewski under the Labor Law.[4]

However, Kowalewski has failed to raise an issue of fact with respect to BMS's duty to him at 2 World Financial Center and 4 World Financial Center. Kowalewski conceded at deposition that his work was not supervised by BMS at 2 World Financial Center. *See* Cannata Decl., Exh. 51 at 491:17-492:9; Cuozzo Decl., Exh. 14, Exh. 19. BMS presents substantial evidence that it did not perform any work at 4 World Financial Center. *See* Cuozzo Decl., Exh.

---

[4] Similarly, for the reasons previously elaborated in *In re World Trade Center Lower Manhattan Disaster Site Litigation*, No. 09-cv-680, 2014 WL 4446153 at *14-15, I reject Hillmann's argument that it did not owe a duty of care to Kowalewski as a non-contracting third party. Kowalewski has raised an issue of fact that the Environmental Consultant Defendants exacerbated the existing hazard by influencing the choice of respiratory equipment incapable of handling that particular hazard and therefore breached an independent duty of care owed to Kowalewski by "launch[ing] a force or instrument of harm." *Espinal v. Melville Snow Contractors*, 98 N.Y.2d 136, 140 (2002).

17 at 164:3-5, Exh. 18 at 61:3-9.  In opposition, Kowalewski has failed to present any controverting evidence.  Accordingly, I grant the motions for summary judgment filed by BMS with respect to Kowalewski's claims arising from his work at 2 World Financial Center and 4 World Financial Center.

Kowalewski has also failed to raise an issue of fact with respect to his claims against TIC arising from his work 130 Liberty Street and 4 Albany Street.  TIC has presented substantial evidence that it lacked the authority to control the choice of personal protective equipment worn by workers or the safety procedures implemented at those two buildings.  *See* Savino Decl., Exh. E ¶ 4, Exh. F ¶ 4, Exh. G at 25:25-27:5, Exh. H at 72:5-14, Exh. J at 305:18-20, 310:4-8, Exh. O at 84:8-85:2, Exh. P,  Exh. R ¶ 1.  In opposition, Kowalewski points to no contrary evidence.  Accordingly, I hold that TIC owed no duty to Kowalewski under the New York Labor Law and grant TIC's motion in its entirety.

Similarly, Kowalewski has not raised a triable issue of fact with respect to IET's duty to him at 2 World Financial Center.  IET has presented evidence that the scope of its work was limited to one-time inspections of the HVAC systems and post-cleanup air monitoring.  *See* Stanley Aff. ¶¶ 4, 13-15, Exh. B, Exh. D.  Further, IET has presented evidence that it neither developed safety and remediation protocols nor supervised Kowalewski's work.  *See* Stanley Aff. ¶¶ 11-15.  Kowalewski has failed to point to any contradictory evidence.  Accordingly, I hold that IET owed no duty to Kowalewski and grant its motion for summary judgment in its entirety.

There is evidence that Deutsche Bank Trust Corporation and DB Private Clients Corporation, with respect to 130 Liberty Street, and Related BPC Associates, Inc., with respect to 225 Rector Place, lacked any legal interest in the respective properties or any authority to

control the personal protective equipment worn or safety procedures implemented. *See* Becker Aff. ¶¶ 7-8; Futterman Decl., Exh. A ¶ 9. Kowalewski has failed to point to any contrary evidence in opposition. Accordingly, I hold that these three parties owed no duty to Kowalewski, grant their respective motions, and dismiss them from the case.[5]

I similarly grant the City of New York's motion for summary judgment. Although the City of New York exercised control over 130 Liberty Street between September 11, 2001 and December 2001, *see* Wies Decl., Exh. I at 29:10-22, 116:13-17, Kowalewski points to no evidence that the City of New York played any role in the decision to treat the cleanup as an asbestos abatement or had any influence over the remediation protocol or choice of requisite protective equipment worn by the workers. Accordingly, Kowalewski has failed to raise an issue of fact with respect to the City of New York's duty to him under the Labor Law.

Finally, I grant the motions filed by Verizon's architectural firms, WF Collins and Syska Hennessy. Kowalewski has utterly failed to point to any evidence in the record that either party had the authority to control or influence the remediation protocols or choice of personal protective equipment and safety procedures implemented at 140 West Street. By contrast, both defendants have pointed to substantial evidence that their work was limited to providing designs for the reconstruction of 140 West Street. *See* Magliano Aff. ¶¶ 2-3, Exh. A § 14.1; Saraniero Aff. ¶¶ 3, 5, Exh. A § 14.1, Exh. B at 71:22-72:9. In addition, I hold that Kowalewski's section 241(6) claims against WF Collins and Syska Hennessy are barred under section 241(9) because there is no evidence that either firm "direct[ed] or control[led] the work for activities other than planning and design." N.Y. Labor Law § 241(9) (McKinney 2014). Accordingly, Kowalewski's claims against WF Collins and Syska Hennessy are dismissed.

---

[5] Kowalewski has also named as a defendant "Deutsche Bank Trust Company." DBTCA alleges that this company does not exist and Kowalewski has presented no evidence to the contrary. Accordingly, his claims against "Deutsche Bank Trust Company" are similarly dismissed.

### D.      New York Labor Law Section 200

Section 200 of the New York Labor Law codifies[6] the common law duty "to protect the health and safety of employees." *In re Joint E. & S. Dist. Asbestos Litig.*, 827 F. Supp. 1014, 1052–53 (S.D.N.Y.1993), *aff'd in part rev'd in part on other grounds*, 52 F.3d 1124 (2d Cir. 1995). Specifically, section 200 requires that a workplace "be so constructed, equipped, arranged, operated and conducted as to provide a reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places." N.Y. Labor Law § 200(1) (McKinney 2014).

Section 200 has two disjunctive standards for determining liability. *See Chowdury v. Rodriguez*, 57 A.D.3d 121, 128 (2d Dep't 2008). When a plaintiff's injury "arises out of defects or dangers in the methods or materials of the work," the "means and methods" standard will apply. *Id.* By contrast, where a plaintiff's injuries arise out of the "condition of the premises rather than the methods or manner of the work," the "premises liability" standard applies. *Id.* If an injury arises from both sets of conditions, concurrently, the proofs are to be evaluated under both standards. *See Reyes v. Arco Wentworth Mgmt. Corp.*, 83 A.D.3d 47, 52 (2d Dep't 2011) ("When an accident is alleged to involve defects in both the premises and the equipment used at the work site, the property owner moving for summary judgment with respect to causes of action alleging a violation of Labor Law § 200 is obligated to address the proof applicable to both liability standards.").

Kowalewski alleges that his injuries arose from two concurrent causes: (1) the toxic "alkaline-based" dust and debris that spewed out of the collapsed World Trade Center buildings on September 11, 2001 and present in each of the relevant buildings, and (2) the use of

---

[6] Because section 200 is a codification of common law negligence, courts analyze the claims simultaneously. *See Wojcik v. 42nd St. Dev. Project*, 386 F. Supp. 2d 442, 455 n. 15 (S.D.N.Y. 2005) (collecting cases).

respiratory equipment and safety procedures inappropriate for the particular hazard posed by the "alkaline-based" dust. Accordingly, I have to evaluate the proofs relevant to both the "means and method" standard and the "premises liability" standard. *See id.*

### 1.   The "Means and Methods" Standard

Where a plaintiff's claim arises out of an alleged defect or condition in the "methods or materials" of the work, a party subject to Labor Law § 200 cannot be held liable unless "it is shown that the party to be charged exercised some supervisory control over the operation." *Ross v. Curtis-Palmer Hydro-Elec. Co.*, 81 N.Y.2d 494, 505 (1993); *see also Persichilli v. Triborough Bridge & Tunnel Auth.*, 16 N.Y.2d 136 (1965).

With the exception of Verizon, the Owner Defendants adequately show that they did not exercise supervisory control over the work giving rise to Kowalewski's injuries. Kowalewski's opposition papers fail to rebut the Owner Defendants' showing. Accordingly, I hold that no genuine issue of material fact under the Section 200 "means and methods" standard exists. Owners Defendants' motions for summary judgment are granted to the extent they seek dismissal of Kowalewski's claims under the Section 200 "means and methods" standard.

However, Kowalewski has presented evidence, sufficient to raise a triable issue of fact, that Verizon exercised supervisory control over his work at 140 West Street. For example, two Hillmann employees testified that Verizon employees were present at the worksite and decided what personal protective equipment workers were required to wear. *See* Cannata Decl., Exh. 115 at 75:15-76:3, Exh. 116 at 80:9-82:6. Accordingly, I deny Verizon's motion for summary judgment to the extent it seeks dismissal of Kowalewski's claims under the Section 200 "means and methods" standard.

I deny the Environmental Consultant Defendants' motions for summary judgment. Kowalewski points to evidence that, at each of the relevant buildings, the Environmental Consultant Defendants played a role in the choice of respiratory equipment and safety procedures employed by the contractors that hired Kowalewski to perform the clean-up work. *See* Goldstein Decl., Exh. J § 2.4, Exh. X at 103:18-105:18; Kauffman Decl., Exh. O ¶ 8; Cannata Decl., Exh. 4 at 106:3-107:16, Exh. 152 at 16:18-24; Calabrese Decl., Exh. C ¶¶ 32, 43-46; Stevenson Decl., Exh. A at 191:2-192:13; Broadwater Decl., Exh. I at 164:7-17, Exh. P, Exh. S. This is sufficient to raise a triable issue of fact as to whether the Environmental Consultant Defendants "exercised supervisory control over the means and method of the work." *Ross*, 81 N.Y.2d at 505.

### 2.  The "Premises Liability" Standard

Where a plaintiff's claim arises out of the condition of the premises, a party is liable if (1) it created the dangerous condition causing the injury or (2) failed to remedy a dangerous or defective condition of which he or she had actual or constructive notice. *See Ortega v. Puccia*, 57 A.D.3d 54, 61 (2d Dep't 2008). Kowalewski presents evidence that the Owner Defendants either retained environmental consultants and contractors specifically to perform asbestos abatement and monitoring or played some role in the decision to implement asbestos abatement procedures at the worksites, leading to the use of allegedly inadequate respiratory equipment. *See, e.g.*, Goldstein Decl., Exh. X at 103:18-105:18; Kauffman Decl., Exh. O ¶¶ 5-7; Cannata Decl., Exh. 152 at 16:18-24; Stevenson Decl., Exh. A at 191:2-192:13; Broadwater Decl., Exh. P; Brown Decl., Exh. K; Futterman Decl., Exh. F. It is true that certain Owner Defendants did not initially limit the scope of the consultants' work to asbestos testing and monitoring. *See, e.g.*, Goldstein Decl., Exh. M. However, on the record before me, I cannot

hold as a matter of law that the Owner Defendants played no role in the allegedly unreasonable decision to use asbestos-specific safety equipment and procedures. Accordingly, for the reasons previously elaborated in *In re World Trade Center Lower Manhattan Disaster Site Litigation*, No. 09-cv-680, 2014 WL 4446153 at *18-19, I deny the Owner Defendants' motions for summary judgment under section 200 of the Labor Law.

### E.   New York Labor Law Section 241(6)

Section 241(6) of the New York Labor Law provides that:

> All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places. The commissioner may make rules to carry into effect the provisions of this subdivision, and the owners and contractors and their agents for such work . . . shall comply therewith.

N.Y. Labor Law § 241(6) (McKinney 2014). The statute imposes a non-delegable duty upon owners, general contractors, and their agents, to ensure worksite compliance with the New York Industrial Code. *See Morris v. Pavarini Constr.*, 22 N.Y.3d 668, 673 (2014); *Rizzuto v. L.A. Wenger Constr. Co.*, 91 N.Y.2d 343, 348 (1998). To prove vicarious liability under section 241(6), a plaintiff must demonstrate that (1) the work giving rise to the injury was in connection with "construction, excavation or demolition"; and (2) a violation of an applicable regulation implementing section 241(6) caused the plaintiff's injury. *See Nagel v. D & R Realty Corp.*, 99 N.Y.2d 98, 101 (2002); *Rizzuto*, 91 N.Y.2d at 348-50. These requirements are addressed in turn.

### 1.   "Construction, Excavation or Demolition"

For the reasons stated in *In re World Trade Center Lower Manhattan Disaster Site Litigation*, No. 09-cv-680, 2014 WL 4446153 at *20-23, I hold that Kowalewski's work at 4 World Financial Center, 4 Albany Street, and 225 Rector Place was not sufficiently related to

"construction, excavation or demolition" to support a claim under section 241(6) of the New York Labor Law. None of these buildings sustained structural damage and the primary damage was limited to an infiltration of World Trade Center dust. *See* Cannata Decl., Exh. 7, Exh. 34 at 44, Exh. 187 at 79:19-80:10. The work performed to remediate these buildings consisted exclusively of cleaning the dust and removing contaminated debris, tiles and sheetrock. *See* Cannata Decl., Exh. 49 at 132:2-8, Exh. 187 at 31:13-19; Brown Decl., Exh. E at 235:14-239:24. Accordingly, I grant the Defendants' motions for summary judgment and dismiss Kowalewski's section 241(6) claims arising from his work at 4 World Financial Center, 4 Albany Street, and 225 Rector Place.

However, Kowalewski has raised a question of fact as to whether his work performed at 2 World Financial Center, 140 West Street, and 130 Liberty Street was sufficiently connected to "construction, excavation or demolition" to support his section 241(6) claims. 2 World Financial Center suffered hundreds of broken windows, demolished walls, and the destruction of the "Winter Garden." *See* Cannata Decl., Exh. 139. Similarly, steel beams from the collapse of 7 World Trade Center caused significant structural damage to 140 West Street. *See* Cannata Decl., Exh. 7 at 7-12, Exh. 137. 130 Liberty Street also sustained severe damage and was later demolished rather than reconstructed. *See* Cannata Decl., Exh. 7; Wies Decl., Exh. L. At these locations, the remediation effort included substantial renovations, including the removal of wall studs, the demolition of walls, and the construction of tunnels for the removal of debris. *See, e.g.*, Cannata Decl., Exh. 17A, Exh. 18C, Exh. 19E, Exh. 53 at 239:2-23, Exh. 54 at 352:23-353:6. Accordingly, with respect to these three buildings, I must address the second prong of section 241(6) liability.

### 2.    Violation of Applicable Industrial Code Provision

Liability under section 241(6) also requires a violation of Part 23 of the New York

Industrial Code, the regulations implementing section 241(6).  *See Kaczmarek v. Bethlehem Steel*

*Corp.*, 884 F. Supp. 768, 779 (W.D.N.Y. 1995); *Nostrom v. A.W. Chesterton Co.*, 59 A.D.3d 159

(1st Dep't 2009).  It is insufficient to allege violations of OSHA regulations, *see Rizzuto*, 91

N.Y.2d at 351 n.1, or Part 12 of the New York Industrial Code, *see Kagan v. BFP One Liberty*

*Plaza*, 60 A.D.3d 531, 532 (1st Dep't 2009).  Further, the provision of Part 23 alleged to have

been violated must "mandate compliance with concrete specifications and not simply declare a

general safety standard or reiterate common-law principles."  *Misicki v. Caradonna*, 12 N.Y.3d

511, 515 (2009); *see also Ross*, 81 N.Y.2d at 505 (1993).  The provision must add a "specific,

positive command" beyond the duty of reasonableness imposed by the common law.  *Ross*, 81

N.Y.2d at 504.

For the reasons previously elaborated in *In re World Trade Center Lower*

*Manhattan Disaster Site Litigation*, No. 09-cv-680, 2014 WL 4446153 at *26-27, I grant the

Defendants' motions with respect to Kowalewski's claims under section 241(6) of the Labor

Law alleging violations of sections 23-1.7(g) and 23-2.1(b) of the Industrial Code.  Kowalewski

alleges that he worked in "chutes" at 140 West Street.  *See* Cannata Decl., Exh. 51 at 421:19-

423:5.  However, he fails to point to any facts that suggest the "chutes" were "enclosed" areas

with "restricted means of egress," as required to be considered a "confined, unventilated area" as

that term has been interpreted by New York courts.  N.Y. Comp. Codes R. & Regs. tit. 12, §§

12-1.3(f), 23-1.7(g) (2014); *Ceverizzo v. City of New York*, 116 A.D.3d 469, 470-71 (1st Dep't

2014); *Kagan*, 60 A.D.3d at 532.  Furthermore, Kowalewski conceded at his deposition that he

never worked in any "confined" space in any of the buildings at issue here. *See* Cannata Decl., Exh. 50 at 268:8-16.

I deny the Defendants' motions with respect to Kowalewski's claims alleging violations of sections 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1) of the Industrial Code. Those provisions impose sufficiently "specific, positive commands" to serve as predicate violations under section 241(6), *Ross*, 81 N.Y.2d at 504, and Kowalewski has presented evidence, sufficient to raise a triable issue of fact, that his injuries were caused by their violation.

## IV.    Conclusion

In summary, and for the foregoing reasons, the motion filed by Hillmann is DENIED with respect Kowalewski's section 200 claims arising from his work at 140 West Street and 2 World Financial Center. The motion is GRANTED with respect to his section 241(6) claims, arising from his work at 2 World Financial Center and 140 West Street, alleging violations of Industrial Code Rules 23-2.1(b) and 23-1.7(g), and DENIED with respect to his section 241(6) claims alleging violations of Industrial Code Rules 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1).

The motion filed by DBTCA is DENIED with respect to Kowalewski's section 200 claims arising from his work at 130 Liberty Street and 4 Albany Street. The motion is GRANTED with respect to his section 241(6) claims arising from his work at 4 Albany Street. The motion is GRANTED with respect to his section 241(6) claims, arising from his work at 130 Liberty Street, alleging violations of Industrial Code Rules 23-2.1(b) and 23-1.7(g), and DENIED with respect to his section 241(6) claims alleging violations of Industrial Code Rules 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1). Defendants Deutsche Bank Trust

Corporation, DB Private Clients Corp., and "Deutsche Bank Trust Company" are dismissed from the case.

The motion filed by Verizon is DENIED with respect to Kowalewski's section 200 claims arising from his work at 140 West Street. The motion is GRANTED with respect to his section 241(6) claims, arising from his work at 140 West Street, alleging violations of Industrial Code Rules 23-2.1(b) and 23-1.7(g), and DENIED with respect to his section 241(6) claims alleging violations of Industrial Code Rules 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1).

The motion filed by BMS is GRANTED in its entirety with respect to Kowalewski's section 200 and section 241(6) claims, arising from his work at 2 World Financial Center and 4 World Financial Center, and Kowalewski's claims against BMS are dismissed.

The motion filed by Liberty View is DENIED with respect to Kowalewski's section 200 claims arising from his work at 225 Rector Place. The motion is GRANTED with respect to his section 241(6) claims, arising from his work at 225 Rector Place.

The motion filed by Weston is DENIED with respect to Kowalewski's section 200 claims arising from his work at 2 World Financial Center and 4 World Financial Center. The motion is GRANTED with respect to Kowalewski's section 241(6) claims arising from his work at 4 World Financial Center. The motion is GRANTED with respect to his section 241(6) claims, arising from his work at 2 World Financial Center, alleging violations of Industrial Code Rules 23-2.1(b) and 23-1.7(g), and DENIED with respect to his section 241(6) claims alleging violations of Industrial Code Rules 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1).

The motion filed by Merrill Lynch is DENIED with respect to Kowalewski's section 200 claims arising from his work at 2 World Financial Center and 4 World Financial

Center.  The motion is GRANTED with respect to Kowalewski's section 241(6) claims arising from his work at 4 World Financial Center.  The motion is GRANTED with respect to his section 241(6) claims, arising from his work at 2 World Financial Center, alleging violations of Industrial Code Rules 23-2.1(b) and 23-1.7(g), and DENIED with respect to his section 241(6) claims alleging violations of Industrial Code Rules 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1).

The motion filed by TIC is GRANTED in its entirety with respect to Kowalewski's section 200 and section 241(6) claims, arising from his work at 130 Liberty Street and 4 Albany Street, and Kowalewski's claims against TIC are dismissed.

The motion filed by the City of New York is GRANTED in its entirety with respect to Kowalewski's section 200 and section 241(6) claims, arising from his work at 130 Liberty Street, and Kowalewski's claims against the City of New York are dismissed.

The motions filed by WF Collins and Syska Hennessy are GRANTED in their entirety with respect to Kowalewski's section 200 and section 241(6) claims, arising from his work at 140 West Street, and Kowalewski's claims against them are dismissed.

The motion filed by IET is GRANTED in its entirety with respect to Kowalewski's section 200 and section 241(6) claims, arising from his work at 2 World Financial Center, and Kowalewski's claims against IET are dismissed.

The Clerk shall mark the following motions in No. 06-cv-01521 as terminated: Doc. No. 194, Doc. No. 198, Doc. No. 203, Doc. No. 207, Doc. No. 211, Doc. No. 214, Doc. No. 215, Doc. No. 225, Doc. No. 230, Doc. No. 236, Doc. No. 237, and Doc. No. 244.  The Clerk shall enter judgment in case number 06-cv-01521 dismissing the Complaint against IET, BMS, TIC, the City of New York, Syska Hennessy, WF Collins, Deutsche Bank Trust Corporation, DB

Private Clients Corp., "Deutsche Bank Trust Company," and Related BPC Associates, Inc. (collectively, the "Dismissed Defendants"), with costs to the Dismissed Defendants.

Kowalewski shall file an Amended Complaint by November 7, 2014, consistent with this Order and Opinion, dropping the Dismissed Defendants from the caption and the allegations and retaining the paragraph numbering of the existing complaint. Defendants' Answers need not be amended.

SO ORDERED.

Dated:     New York, New York
           October 17, 2014

ALVIN K. HELLERSTEIN
United States District Judge

29